FILED
United States Court of Appeals
Tenth Circuit

**August 17, 2010**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

MAGNESIUM CORPORATION OF
AMERICA; RENCO METALS; THE
RENCO GROUP; IRA L. RENNERT;
IRA LEON RENNERT REVOCABLE
TRUST,

    Defendants,

and

U.S. MAGNESIUM LLC,

    Defendant-Intervenor-
Appellee.

No. 08-4185

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:01-CV-00040-DB)**

---

Robert H. Oakley (John C. Cruden, Acting Assistant Attorney General; Lisa
Jones; and David Street, with him on the briefs), Environment & Natural
Resources Division, U.S. Department of Justice, Washington, D.C., for Plaintiff-
Appellant United States of America.

Michael D. Zimmerman (Alan L. Sullivan and Troy L. Booher with him on the
brief), Snell & Wilmer, L.L.P., Salt Lake City, UT, for Defendants Magnesium

Corporation of America, Renco Metals, The Renco Group, Ira L. Rennert, and Ira Leon Rennert Revocable Trust.

Francis M. Wikstrom (David W. Tundermann, M. Lindsay Ford, and Juliette P. White, with him on the brief), Parsons Behle & Latimer, Salt Lake City, UT, for Defendant-Intervenor-Appellee U.S. Magnesium LLC.

---

Before **TYMKOVICH**, **EBEL**, and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

As its name advertises, U.S. Magnesium produces magnesium, though in doing so it also generates various waste byproducts. This lawsuit concerns five of those wastes. The government says that U.S. Magnesium's handling of the wastes must but hasn't complied with regulations promulgated under Subtitle C of the Resource Conservation and Recovery Act of 1976 ("RCRA"). For its part, U.S. Magnesium challenges the premise of the government's suit, arguing that the Environmental Protection Agency ("EPA" or the "Agency") exempted the five wastes from Subtitle C's strictures in a prior interpretation of its own regulation. And, U.S. Magnesium says, the Agency cannot change that interpretation now, at least not without first complying with the notice and comment procedures of the Administrative Procedure Act ("APA"). At summary judgment, the district court agreed with U.S. Magnesium and entered judgment in its favor.

We must vacate that judgment. Even if we assume with U.S. Magnesium that a *definitive* regulatory interpretation prohibits an agency from later changing

- 2 -

course and issuing a new interpretation without first undergoing notice and comment, that's simply not our case. The only prior EPA interpretation U.S. Magnesium can point to is, at best, a *tentative* one. Because EPA never previously adopted a definitive interpretation, it remained free, even under the legal precedents on which U.S. Magnesium seeks to rely, to change its mind and issue a new interpretation of its own regulations without assuming notice and comment obligations.

I

U.S. Magnesium mines and processes magnesium at its plant in Rowley, Utah, on the western shore of the Great Salt Lake.[1] The Rowley facility, as it's known, extracts primary magnesium using what U.S. Magnesium refers to as the

---

[1] U.S. Magnesium is just the latest owner of this facility. From 1980 to 1989, it was owned by Amax Inc. Amax sold the facility in 1989 to Magnesium Corporation of America ("MagCorp"), which in turn sold all of its assets to U.S. Magnesium in 2002. Both MagCorp and U.S. Magnesium, however, are owned and controlled by the same corporate parent, The Renco Group, which in turn is managed by private trusts created for the benefit of Ira Rennert and his family. *See* Second Am. Compl., U.S. App. Vol. I at 96-98; Answer Br., Corporate Disclosure Statement; Opening Br. at 6 & n.3. The government thus brought its lawsuit against not just U.S. Magnesium, but also against the various so-called "Renco parties": Renco Metals, Inc., Renco Group, the Ira Rennert Revocable Trust, and Ira Rennert himself. *See* Opening Br. at 6 & n.3; Second Am. Compl., U.S. App. Vol. I. at 110-13. (Other parties named in the original complaint were later dismissed by operation of superseding complaints. *See* U.S. App. Vol. I. at 6-7.) For ease of reference and except as otherwise noted, we refer to the appellees here collectively as "U.S. Magnesium."

"anhydrous" process.[2]  That process — intricate, sophisticated, and well known to the parties — yields a variety of dangerous waste products.  To make those waste products less dangerous, the facility uses a number of pollution-control measures.  And many of these measures in turn generate other wastes, some of which are dangerous in their own right.  This case concerns the interaction between five such "pollution-control wastes" and RCRA.  By way of background, we first outline the relevant RCRA regulatory history (Section I.A) and the history of this lawsuit (Section I.B), before turning to our analysis of the appeal now before us (Section II).

A

In Subtitle C of RCRA, Congress required EPA to promulgate regulations establishing a comprehensive regulatory scheme for the transportation, treatment, and disposal of hazardous wastes.  *See* 42 U.S.C. §§ 6921-6939f.  Meanwhile, Subtitle D of the statute addressed the regulation of nonhazardous solid wastes and authorized EPA to prepare regulations subjecting these wastes to less rigorous requirements.  *See id.* §§ 6941-6949a.

---

[2]  A brief vocabulary primer may be in order.  The parties agree that "primary magnesium processing" refers to the extraction of magnesium directly from ore or mineral deposits, as opposed to the reprocessing of scrap metal.  *See* Answer Br. at 4.  "Anhydrous" literally means "without water," and U.S. Magnesium apparently uses the term to indicate the fact that many of the key chemical reactions in the facility's magnesium production process do not require the use of any water.  *See* Opening Br. at 5; *see also* U.S. Magnesium's Memorandum in Support of Motion for Partial Summary Judgment (6/26/06), at 5 n.6.

After RCRA's enactment, EPA in 1978 proposed regulations implementing Subtitle C for notice and comment. Under that proposal, wastes related to the processing of ores or minerals generally were to be subject to Subtitle C, rather than Subtitle D. At the same time, mineral processing wastes produced in "very large volumes" but that were believed to pose "relatively low" health risks — a category apparently anticipated to include at least some of the wastes produced at Rowley — were to benefit from less stringent Subtitle C regulations than other hazardous wastes. *See* 43 Fed. Reg. 58,946, at 58,991-92 (1978). After proposing its rule and receiving public comment, however, EPA changed its mind on this particular point, and the final Subtitle C regulations the Agency issued in 1980 treated large volume, low risk mineral processing wastes as hazardous wastes subject to the same stringent Subtitle C requirements as other such wastes. *See* 45 Fed. Reg. 33,154, at 33,173-75 (1980).

Just before EPA's final Subtitle C regulations were to take effect, however, Congress reentered the picture. Apparently unsatisfied with the Agency's final decision to subject all hazardous mineral processing wastes to more stringent Subtitle C regulations, Congress enacted the so-called Bevill Amendment, named for its principal legislative sponsor. *See* Pub. L. No. 96-482, 94 Stat. 2334, *codified at* 42 U.S.C. § 6921(b)(3)(A)(ii). The Bevill Amendment essentially sent EPA back to the drawing board when it came to wastes generated in connection with the processing of ores and minerals. Congress required the Agency to

- 5 -

conduct a "comprehensive study on the adverse effects on human health and the environment, if any, of the disposal and utilization of solid waste from the extraction, beneficiation, and processing of ores and minerals," and to produce in three years time a report for Congress's consideration. 42 U.S.C. § 6982(p); *see also id.* § 6982(f). To forestall any interstitial regulation, the Amendment required EPA to postpone the application of Subtitle C regulations to all mineral processing wastes until at least six months after the submission of the congressional report. *Id.* § 6921(b)(3)(A). In addition, Congress required EPA to determine — or redetermine, on the basis of "information developed or accumulated pursuant to such study, public hearings, and comment" — whether it should regulate ore and mineral processing wastes under Subtitle C or under a less stringent regime, such as Subtitle D. *Id.* § 6921(b)(3)(C). *See generally Envt'l Def. Fund v. EPA*, 852 F.2d 1316, 1318-20 (D.C. Cir. 1988).

So it is that EPA set out to determine the proper scope of the so-called Bevill exemption from RCRA Subtitle C. Eventually, the Agency published a proposed rule laying out various criteria to identify which mineral processing wastes should be held exempt from Subtitle C in light of the Bevill Amendment and subject instead to less onerous regulations, the exact details of which the Agency had yet to specify. 53 Fed. Reg. 41,288 (1988). In response to EPA's call for comments, the then-owner of the Rowley facility nominated various of the wastes it produced for exemption under these criteria. Aple. Supp. App. at 11, 15.

After various regulatory investigations and following more notice and comment, EPA issued a new rule in September 1989.  54 Fed. Reg. 36,592 (1989). This rule finalized the criteria a waste must meet to qualify for exemption from Subtitle C.  Among other things, the criteria required a candidate waste to be "uniquely associated with mineral industry operations" and produced in "high volumes" and with "low hazard" levels — thus closely tracking and elaborating EPA's initial proposal from back in 1978.  *See id.* at 36,628-31.  Applying the criteria it had announced, EPA proceeded to opine that several wastes, including "[p]rocess wastewater from primary magnesium production by the anhydrous process" — the category of wastes at issue in this case — were likely candidates for exemption, subject to further data collection and study, the required report to Congress, and a final Agency determination.  *See id.* at 36,631 & 36,642.  *See generally Solite Corp. v. EPA*, 952 F.2d 473, 480-82 (D.C. Cir. 1991) (per curiam).[3]

In July 1990, EPA submitted its *Report to Congress on Special Wastes from Mineral Processing.*  *See* 55 Fed. Reg. 32,135 (1990) (announcing availability of report).  The Report contained a detailed study of each of the various wastes previously proposed for exemption and recommended the exemption of many,

_____

[3]  A January 1990 rule later removed some wastes from the conditionally-retained category and disqualified them from receiving any exemption, though the rule didn't alter the conditional status of magnesium processing wastes.  *See* 55 Fed. Reg. 2322 (1990).

including "[p]rocess wastewater from primary magnesium processing by the anhydrous process," *id.* at 32,136, though in doing so the Agency repeatedly noted that its "findings" on this score remained "tentative," *id.* at 32,135.[4] Accordingly, EPA encouraged interested parties to review the Report and offer comments, which the Agency said it would use "in conjunction with the Report . . . to make the final regulatory determination." *Id.*

After publishing its Report to Congress and considering the public comments it had invited, EPA promulgated a "[f]inal regulatory determination and final rule" in June 1991. This rule sought to apply the criteria for exemption announced in the Agency's 1989 rule to certain candidate wastes. 56 Fed. Reg. 27,300, at 27,300 (1991). In so doing, EPA confirmed that "[p]rocess wastewater from primary magnesium processing by the anhydrous process," among many other candidate wastes, now definitively qualified for exemption from Subtitle C and should be subject to less onerous regulatory terms, mostly under Subtitle D. *Id.* at 27,307. In this final rule, however, EPA did not purport to interpret the

---

[4] *Accord* 55 Fed. Reg. at 32,137 ("[T]he Agency developed two approaches for *tentatively* determining whether regulation under RCRA subtitle C is warranted . . . .") (emphasis added); *id.* (repeatedly describing what EPA "might find" in the future); *see also* Report to Congress, U.S. App. Vol. I at 184-85 (listing "[p]rocess wastewater from primary magnesium processing by the anhydrous process" among "Wastes EPA Might Tentatively Recommend to Remain Under RCRA Subtitle D"); *id.* at 201 ("tentatively concluded"); *id.* at 202 (same).

phrase "[p]rocess wastewater from primary magnesium processing by the anhydrous process." *Id.* at 27,306-07.

Beginning in 1991, EPA, the operators of the Rowley facility, and the State of Utah engaged in a series of discussions, wrote letters, and debated what this phrase encompasses and what it does not. Ultimately, the parties reached loggerheads. U.S. Magnesium took the view that the 1991 final rule exempted from Subtitle C *all* of the Rowley facility's pollution-control wastes. The Agency disagreed, arguing that its rule only exempted *some* such wastes and that others remained subject to Subtitle C disposal requirements. This lawsuit followed in 2001.

B

In its 2001 complaint, the government sought injunctive relief and civil penalties for various alleged violations of RCRA and its implementing regulations. In 2005, the government filed an additional, related complaint — eventually consolidated with its RCRA complaint — alleging violations of a different statute, the Toxic Substances Control Act ("TSCA"). *See* U.S. App. Vol. I at 145-46. But the heart of the lawsuit always was and remains the status of five wastes, appropriately dubbed "the Complaint wastes." Before the district court, the government argued that these wastes don't qualify for exemption from Subtitle C because they're not "[p]rocess wastewater from primary magnesium processing by the anhydrous process," as required by EPA's 1991 rule. *See* Second Am. Compl.

¶ 62, U.S. App. Vol. I at 109. This argument splits into two parts: according to EPA, most of the Complaint wastes aren't — in the words of the rule — "from primary magnesium processing," while the final remaining Complaint waste doesn't qualify as a "wastewater." Some explanation is in order. The company's magnesium production process generates large amounts of chlorine gas, which the company then processes to produce hydrochloric acid and chlorine for its own use and for sale. And the company's hydrochloric acid and chlorine production processes themselves yield various wastes. The government argued to the district court that these wastes — four of the five Complaint wastes — don't qualify for exemption because they're not "process wastewater *from primary magnesium processing*." 56 Fed. Reg. at 27,307 (emphasis added). Rather, they're process wastewaters from the *processing of something else*. *See, e.g.*, United States' Combined Summary Judgment Memorandum at 41 ("The wastewaters that are the subject of the Complaint are wastewaters from the processing of chlorine and hydrogen chloride gasses [sic], not from the processing of the mineral magnesium."). Likewise, EPA took the position that, even if the fifth Complaint waste — dry anode dust — is the direct result of magnesium processing, it still isn't a "waste*water*" within the meaning of the 1991 rule, but rather a non-exempt waste *solid*. *See id.* at 38. Thus, to the Agency's view, none of the five Complaint wastes fits under the umbrella of wastes exempted from regulation under Subtitle C.

In reply, U.S. Magnesium rested heavily on EPA's 1990 Report to Congress. In the company's view, certain language and a diagram in the Report suggested strongly that EPA had, at least then, interpreted the phrase "[p]rocess wastewater from primary magnesium processing by the anhydrous process" to mean that *all* pollution-control wastes produced at the Rowley facility, including each of the five Complaint wastes, were exempt from regulation under Subtitle C. In the company's view, EPA's lawsuit now sought to enforce a different, narrower interpretation of the term "[p]rocess wastewater from primary magnesium processing by anhydrous process." And under principles of administrative law, U.S. Magnesium submitted, this EPA could not do. U.S. Magnesium submitted that an agency may not interpret its own regulations in a way that conflicts with its own prior interpretation — at least not without first engaging in notice and comment, a process EPA admittedly had not undertaken.

Following extensive proceedings over several years that culminated in briefing at summary judgment, the district court eventually agreed with U.S. Magnesium. The court seemed to consider EPA's current interpretation of its 1991 rule — that the five Complaint wastes are not "[p]rocess wastewater from primary magnesium processing by the anhydrous process" — to be "plausible" as an initial matter. *See* D. Ct. Op. at 25 (holding that "each of the parties' interpretations of the exemption for primary magnesium processing wastewaters," the language used in the 1991 final rule, "[is] plausible"). But, the court held, the

Agency's current interpretation was different from the interpretation it previously adopted in its 1990 Report to Congress and elsewhere. And, the court seemed to believe, EPA could not now change its interpretation of its own 1991 rule without first providing an opportunity for notice and comment. *See* Answer Br. at 29 (U.S. Magnesium characterizing the district court opinion as having "rejected the government's current interpretation because it was inconsistent with the original interpretation"). Given all this, the district court held that partial summary judgment for U.S. Magnesium on the Complaint waste claims was required as a matter of law.[5]

Of course, a partial summary judgment does not a final judgment make, and the jurisdiction of the federal circuit courts ordinarily extends only to the final judgments of the federal district courts. *See, e.g.*, *Van Cauwenberghe v. Biard*,

---

[5] While the district court did focus on the question when an agency may amend its interpretation of its own rule, the court also appears to have cast its legal gaze more broadly. At points, its summary judgment opinion seems to suggest that the court felt a *de novo* duty to "decide what constitutes 'process wastewater from primary magnesium processing by the anhydrous process.'" D. Ct. Op. at 21-22. That view is incorrect. When regulatory language is "ambiguous," as the district court acknowledged the language of the 1991 rule is, *id.* at 22, and an agency has offered a "plausible" interpretation of that language, as the district court seemed to agree EPA has in this case, *id.* at 25, the agency's interpretation usually merits substantial deference, *see Auer v. Robbins*, 519 U.S. 452, 461 (1997). The district court, however, did not appear to grapple with this rule of administrative law. And perhaps as a result, U.S. Magnesium seeks to defend the district court's ruling on appeal by focusing on the court's extended discussion about asserted differences between EPA's current interpretation of the language in its 1991 rule and prior interpretations the Agency had given the same language in the past.

- 12 -

486 U.S. 517, 521 (1988) (citing 28 U.S.C. § 1291).  As a result, and to

manufacture a final judgment out of the district court's partial summary judgment

for U.S. Magnesium, the parties stipulated to the dismissal with prejudice of "[a]ll

remaining claims pending in this action."  Final Judgment, U.S. App. Vol. I at 89.

The district court granted the motion, thus making the "summary judgment ruling

. . . a final and appealable judgment."  *Id.*  It is this judgment EPA now appeals to

us.[6]

---

[6]  As an initial matter, we must determine which claims of the operative complaint are at issue in this appeal.  Essentially, the government's lawsuit alleged three categories of violations:  (1) the unlawful disposal of the five Complaint wastes, in violation of the RCRA Subtitle C regulations, (2) other violations of RCRA unrelated to the treatment of the five Complaint wastes, and (3) violations of TSCA.  It is undisputed that this appeal involves only the first category of claims and that the second and third categories were dismissed by the stipulation of the parties.  The government has indicated — and none of the defendants seem to dispute, despite opportunity to do so — that this first category includes claims 1, 4-7, and 9-15 of the second amended complaint.  *See* Opposition to Renco Parties' Motion to be Dismissed from Appeal, at 5.  Our own examination of the operative complaint confirms the government's view.

With respect to these remaining claims, the "Renco parties," *see supra* note 1, have moved to be dismissed from this appeal on the basis that they are no longer parties to the dispute.  The district court, they submit, only granted partial summary judgment on claims involving U.S. Magnesium, and the court's subsequent dismissal with prejudice of "all remaining claims pending in this action" included all of the government's claims against the Renco parties.  This argument is incorrect.  The claims at issue in the district court's partial summary judgment ruling, and alive before us in this appeal, named the Renco parties as defendants.  Nothing in the district court's subsequent dismissal with prejudice of *other* claims alters this fact.  The Renco parties thus remain parties to this appeal and to EPA's RCRA claims involving the five Complaint wastes, and we deny their motion to be dismissed from this appeal.

II

We review appeals from a district court's decision to grant summary judgment *de novo*, and will affirm only if, viewing the facts in the light most favorable to the non-movant, we discern no genuine dispute of material fact in need of resolution by a factfinder and conclude that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As it happens, this case presents a pure question about the legal consequences of undisputed facts. The precise contours of that question, though, require some explanation. That is where we begin (Section II.A) before turning to the parties' arguments about that question (Section II.B) and finally our disposition of it (Section II.C).

A

In identifying what *is* in dispute in this case, it is important to start by delineating what *isn't*. While it appears much may have once been disputed in the district court, *see supra* notes 5 & 6, the case as it has been briefed to us has narrowed considerably. Before us, the parties don't dispute that EPA's 1991 final rule is "ambiguous." *See* Answer Br. at 34. As U.S. Magnesium argues and EPA doesn't contest, the 1991 rule — exempting from regulation under Subtitle C "process wastewater from primary magnesium processing by the anhydrous process" — is anything but self-defining. *See id.* Next, the parties also agree that the Agency's current interpretation of that language — an interpretation that excludes all of the five Complaint wastes — is, as the district court noted, a

- 14 -

"plausible" one. *See id.* at 32. Finally, the parties all acknowledge that, usually at least, an agency's interpretation of its own ambiguous regulation is entitled to deference from the courts under *Auer v. Robbins*, 519 U.S. 452, 461 (1997). *See* Answer Br. at 30 ("Nor do the parties dispute that where a regulation is ambiguous, an agency's interpretation of its own regulation must be given substantial deference.").

With all this agreed, or at least not disputed, we are in the end asked to decide just one question of law: whether EPA is precluded from pursuing its current and concededly plausible interpretation of its ambiguous 1991 regulation, under which the five Complaint wastes do not qualify as "process wastewater from primary magnesium processing by the anhydrous process," because the Agency previously — especially in its 1990 Report to Congress — offered a different and inconsistent interpretation of that language. As U.S. Magnesium puts it, "[t]he sole issue presented in this appeal is whether EPA is bound by its original, contemporaneous interpretation of an ambiguous regulation. Stated otherwise, can EPA change its original interpretation of the regulation without following the [notice and comment] procedural requirements of the Administrative Procedure[] Act ("APA")"? Answer Br. at 2.

U.S. Magnesium's brief sometimes hints that EPA's current interpretation of the language in its 1991 final rule might be challenged as arbitrary and capricious or otherwise unlawful in its own right, apart from any purported inconsistency

with EPA's own prior interpretation of the rule's terms. *See, e.g.*, Answer Br. at 55-60; *see also* Opening Br. at 27-31, 37-42 (defending reasonableness of Agency's current view). But the company doesn't develop any such argument before us. So, for example, U.S. Magnesium's appellate brief never cites § 706 of the APA or any other legal authority necessary to advance an argument of that sort. Instead, each time the company might be perceived as raising some other complaint, it recurs to the theme that the real problem is the inconsistency between the Agency's current interpretation of the language in its 1991 rule and the prior interpretation EPA gave that same language, especially in its Report to Congress. *See*, *e.g.*, Answer Br. at 2 (telling us this inconsistency is the "sole issue" in this case); *id.* at 30 ("The dispute centers on whether any deference must be given to an agency's later re-interpretation of a regulation that substantially changes its original interpretation."); *id.* at 33 ("[T]he only remaining issue is whether EPA's contemporaneous interpretation of the Bevill Amendment exemptions is inconsistent with EPA's current interpretation."). And all of the case law the company cites to us concerns only whether and under what circumstances an agency may amend or abandon its interpretation of a previously adopted substantive (or legislative) rule. *See* Answer Br. at 30-33.[7]

---

[7] Likewise, U.S. Magnesium doesn't develop an argument that EPA *isn't* currently offering a plausible interpretation of the language of its 1991 rule but is *instead* covertly attempting to apply the criteria announced in its 1989 rule in an entirely new and different way, thus amending its 1991 substantive rule. And

(continued...)

B

Having isolated the sole issue presented for our decision, what do the parties

have to say about it?

According to U.S. Magnesium, EPA first interpreted the ambiguous

language of its 1991 rule in its 1990 Report to Congress. Of course, that leads one

to wonder how an agency might in 1990 interpret a rule that didn't come into

existence until 1991. But to this the company has a ready reply. The 1991

regulation used the same ambiguous language as the 1989 rule: "[p]rocess

wastewater from primary magnesium processing by the anhydrous process." 56

Fed. Reg. at 27,307. And the 1990 Report to Congress interpreted this language.

---

[7](...continued)
neither does the company complain that EPA is barred from consulting the criteria in its 1989 rule to inform its current interpretation of the terms of its 1991 rule. To be sure, the company hints at the former argument, primarily in its "Summary of Argument." *See* Answer Br. at 26 ("The government now wants to apply a different reading of the [1989 rule] criteria that conflicts with the way EPA applied those criteria and then explained its application to Congress."). But this assertion never receives the sort of full exposition and joinder of issue necessary to enable our review. *See Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) ("[I]ssues adverted to" but "unaccompanied by some effort at developed argumentation, are deemed waived." (quotation marks omitted)); *see also Bronson v. Swenson*, 500 F.3d 1099, 1105 (10th Cir. 2007) ("[C]ursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine."). The company doesn't, for example, cite any statutory authority or relevant case law necessary to support such an argument. To the contrary, and again, U.S. Magnesium directs us to case law regarding when an agency may alter its *interpretation* of a substantive rule; the company repeatedly treats EPA's current view as an interpretation of the 1991 rule's ambiguous language; and the company engages the Agency's use of the 1989 rule's criteria on its own terms, arguing that they hurt rather than help EPA's interpretation of the 1991 rule.

So, as a practical matter, U.S. Magnesium says, EPA's Report to Congress discussing this language from the 1989 rule also amounts to an interpretation of the 1991 rule. *See* U.S. Magnesium's Memorandum in Support of Partial Summary Judgment at 48. And in the 1990 Report, the company adds, EPA effectively took the view that *all* of the Rowley facility's pollution-control wastes, including the five Complaint wastes, were exempt from the strictures of Subtitle C. Having espoused this interpretation of its own regulation, U.S. Magnesium argues, the Agency must abide it unless and until it adopts a new interpretation through notice and comment rulemaking. As the company sees it, EPA's current enforcement action represents the Agency's impermissible attempt to short-circuit that required procedure.

In response, the Agency doesn't seem to dispute that its 1990 Report effectively interpreted its later 1991 rule by offering a view about the meaning of the phrase "process wastewater from primary magnesium processing by the anhydrous process." So, for purposes of this appeal, we will assume without deciding that to be the case. Instead, EPA focuses its fire on the argument that the initial interpretation it offered in the 1990 Report to Congress was a *tentative* one, and an agency, EPA says, need not undertake the rigors of notice and comment to change a merely tentative interpretation of its own rules.

C

On this score, we must agree with EPA. Even assuming the rule of administrative law that U.S. Magnesium urges us to adopt — that an agency may not interpret a substantive (or legislative) regulation one way and then later adopt a competing interpretation without undergoing notice and comment rulemaking — the initial interpretation is only binding if it is *definitive*. And, as we will explain, nothing in EPA's Report to Congress, or in its other communications or actions, qualifies as that. So, even if we accept the company's premise that EPA previously adopted an interpretation of its 1991 final rule, and that EPA now seeks to modify that interpretation, U.S. Magnesium's argument *still* suffers a fundamental flaw. It is on this flaw that we focus our attention.

1

In support of its claim that an agency may not abandon a prior interpretation of its own ambiguous regulation without first going through notice and comment, U.S. Magnesium directs our attention to certain cases from the D.C. Circuit, beginning with *Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999). In that case, plaintiffs who worked as fishing and hunting guides in Alaska challenged a Federal Aviation Administration ("FAA") notice that required the guides to comply with commercial airline regulations. The notice broke dramatically with the practice of the FAA's Alaskan Region, which for decades had advised guides that they were exempt from restrictions on commercial pilots.

The court of appeals declared the new notice invalid, holding that the agency

couldn't "significantly revise[]" its previous "definitive interpretation" of its own

regulations without first engaging in "notice and comment." *Id.* at 1034.

In reaching that holding, *Alaska Hunters* relied almost exclusively on *dicta*

from an earlier D.C. Circuit case suggesting that "[o]nce an agency gives its

regulation an interpretation, it can only change that interpretation as it would

formally modify the regulation itself:  through the process of notice and comment

rulemaking." *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579,

586 (D.C. Cir. 1997).  And to reach that conclusion, *Paralyzed Veterans* in turn

started with the well-known premise that the APA generally requires an agency to

allow for notice and comment before it issues any new rules.  *See* 5 U.S.C. § 553.[8]

Of course, § 553 specifically exempts *interpretive* rules from its notice and

comment requirements, *see* 5 U.S.C. § 553(b)(A), but this exemption, *Paralyzed*

*Veterans* suggested, doesn't apply when an agency *amends* a previous

interpretative rule.  This is so, the court said, because a different provision of the

APA defines the term "rule making" to include the "agency process for . . .

amending . . . a rule," *id.* § 551(5), so, *ipso facto*, amending a rule requires notice

and comment.  *See Paralyzed Veterans*, 117 F.3d at 586.  The implicit reasoning

appears to be this:  if an agency amends its interpretation of a rule, it is effectively

---

[8]   Section 553's notice and comment rulemaking procedures generally control but are distinct from formal (or on the record) rulemaking procedures governed by § 556.

"amending . . . [the] rule" itself, 5 U.S.C. § 551(5), and the APA by its own terms defines this amendment as a kind of rulemaking, something the agency may not accomplish without notice and comment procedures. "To allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment," the court explained, would "undermine" the notice and comment provisions of the APA. *Paralyzed Veterans*, 117 F.3d at 586.

*Paralyzed Veterans* and *Alaska Hunters* have generated considerable debate. As the government points out, the issue whether an agency may alter its interpretation of its own regulation without notice and comment is the subject of a circuit split, with the Third, Fifth, and Sixth Circuits apparently adopting the D.C. Circuit's view and the First and Ninth Circuits seemingly taking the contrary

position.[9]  Our circuit, as far as we can tell, hasn't yet had an opportunity to weigh

in.[10]

Commentators, however, have joined the fray.  As a matter of statutory

construction, some critics suggest, the text of the APA can't bear the weight

foisted upon it by *Alaska Hunters*.  The D.C. Circuit relied primarily on APA

§ 551(5) for its holding, but that section, these scholars observe, merely offers a

---

[9]  *Compare SBC Inc. v. FCC*, 414 F.3d 486, 498 (3d Cir. 2005) ("[I]f an agency's present interpretation of a regulation is a fundamental modification of a previous interpretation, the modification can only be made in accordance with the notice and comment requirements of the APA."), *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 (5th Cir. 2001) ("[T]he APA requires an agency to provide an opportunity for notice and comment before substantially altering a well established regulatory interpretation."), *and Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 682 (6th Cir. 2005) ("It is true that once an agency gives a regulation an interpretation, notice and comment will often be required before the interpretation of that regulation can be changed." (emphasis omitted)), *with Warder v. Shalala*, 149 F.3d 73, 81-82 (1st Cir. 1998), *and Erringer v. Thompson*, 371 F.3d 625, 632 (9th Cir. 2004) ("[N]o notice and comment rulemaking is required to amend a previous interpretive rule." (emphasis omitted)).  Notably, neither *Warder* nor *Erringer* explicitly analyzes, or even discusses, *Paralyzed Veterans* or *Alaska Professional Hunters*.

[10]  U.S. Magnesium quotes *Mission Group Kansas, Inc. v. Riley*, 146 F.3d 775, 782 (10th Cir. 1998), in an effort to show that this court has adopted the *Alaska Hunters* rule.  *See* Answer Br. at 31.  But the quoted material merely restates the hornbook maxim that substantive (or legislative) rules stake out new territory and thus require notice and comment, while interpretive rules merely explain existing legislative rules and thus do not.  *See* 5 U.S.C. § 553; *see also* Richard J. Pierce, Jr., 1 Administrative Law Treatise § 6.4 (4th ed. 2002).  We have suggested, albeit in a general way, that agencies must provide some notice when they change the law, *see Bartlett Mem'l Med. Ctr. v. Thompson*, 347 F.3d 828, 846-47 (10th Cir. 2003) (Briscoe, J., concurring and dissenting) (citing cases), but that doesn't seem to us to answer the question that is the subject of the circuit split.

- 22 -

*definition* of rulemaking.  For a prescription of *how to conduct* rulemaking, we

must look instead at § 553, which makes perfectly clear that the notice and

comment procedures required for substantive (or legislative) rules just don't apply

to "interpretative rules."  5 U.S.C. § 553(b)(A) ("Except when notice or hearing is

required by statute, this subsection [requiring notice and comment] does not apply

. . . to interpretative rules, general statements of policy, or rules of agency

organization, procedure, or practice.").  And so it doesn't matter whether an

interpretive rule is the first or second or seventeenth in a series:  on this view,

none has to undergo notice and comment before taking effect.  The *Alaska Hunters*

regime misses this point, the argument goes, and in so doing flouts the APA's

clear distinction between interpretive and substantive rules.  *See, e.g*, Richard J.

Pierce, Jr., *Distinguishing Legislative Rules from Interpretive Rules*, 52 Admin. L.

Rev. 547, 567 (2000); Jon Connolly, Note, Alaska Hunters *and the D.C. Circuit: A

Defense of Flexible Interpretive Rulemaking*, 101 Colum. L. Rev. 155, 172-73

(2001).[11]

---

[11]  Some critics have also argued that *Alaska Hunters* defies the dictates of
the Supreme Court.  So, for example, they suggest that, by imposing more
administrative procedure than the APA requires, *Alaska Hunters* might contravene
the Court's admonitions against that practice in *Vermont Yankee*.  *See* William
Funk, *A Primer on Legislative Rules*, 53 Admin. L. Rev. 1321, 1329-30 (2001);
*see also Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435
U.S. 519 (1978).  And *Alaska Hunters* sits in tension, they say, with the Court's
view that "consistency with earlier and later pronouncements" is just one factor
that bears upon judicial review of an agency's interpretation, rather than an
outcome-determinative test.  *See* Pierce, *supra*, at 572-73 (quoting *Skidmore v.*
(continued...)

Other scholars take a different view. One possible way to defend the *Alaska Hunters* doctrine, they suggest, may be that an interpretation of a substantive (or legislative) regulation essentially becomes part of that regulation itself. On this logic, a superseding interpretation would necessarily amend the substantive regulation and thus require notice and comment. *See* Richard W. Murphy, Hunters *for Administrative Common Law*, 58 Admin. L. Rev. 917, 923 (2006).[12]

2

Though U.S. Magnesium spends considerable energy encouraging us to join the circuits that have adopted *Alaska Hunters*, and invites us to conclude that those circuits have the better view of administrative law, we have no need to wade into such deep waters to decide the appeal before us. This is because, even if we assume without deciding that *Alaska Hunters*'s reading of the APA is the correct

---

[11](...continued)
*Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also id.* at 572 n.165 (citing Supreme Court cases).

[12] The academic debate also proceeds beyond the legal realm we inhabit to the policy realm usually reserved for others, contending variously that *Alaska Hunters* does and does not promote sound policy. Some worry that its rule diminishes agency flexibility, discourages informal agency guidance, and deters agencies from interpreting their regulations. *See* Connolly, *supra*, at 169-72; *see also* Peter L. Strauss, *Publication Rules in the Rulemaking Spectrum: Assuring Proper Respect for an Essential Element*, 53 Admin. L. Rev. 803, 847 (2001). Others reply that agency interpretations encourage and create settled public expectations that equity suggests shouldn't be lightly disturbed. *See*, *e.g.*, Ryan DeMotte, Note, *Interpretive Rulemaking and the* Alaska Hunters *Doctrine: A Necessary Limitation on Agency Discretion*, 66 U. Pitt. L. Rev. 357, 370-76 (2004).

one (as U.S. Magnesium argues), the company still cannot prevail. By its terms, the *Alaska Hunters* doctrine applies only to *definitive* regulatory interpretations; even under *Alaska Hunters*, an agency remains free to disavow and amend a *tentative* interpretation of one of its rules without notice and comment. And the only prior interpretation U.S. Magnesium has identified in this case can fairly be characterized as no more than that — tentative.

Under the *Alaska Hunters* line of cases on which U.S. Magnesium relies, an agency commits itself to a particular interpretation of its own regulation only when it adopts that interpretation *definitively*, and "conditional or qualified statements, including statements that something 'may be' permitted, do not establish definitive and authoritative interpretations." *MetWest Inc. v. Sec'y of Labor,* 560 F.3d 506, 509-10 (D.C. Cir. 2009); *see also Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1041 (D.C. Cir. 2008) (holding that "guidance documents [that] were far from conclusive in what they said" were insufficient to bind agency's future interpretation of regulation); *Darrell Andrews Trucking, Inc. v. Fed. Motor Carrier Safety Admin.*, 296 F.3d 1120, 1126 (D.C. Cir. 2002) (holding that agency's "ambiguous" regulatory guidance did not "mark a definitive interpretation" and thus did not constrain its subsequent discretion); *Ass'n of Am. R.R. v. Dep't of Transp.*, 198 F.3d 944, 948-50 (D.C. Cir. 1999) (holding agency "never adopted a definitive interpretation of [the regulation] that it could change only through notice and comment rulemaking" because "none of th[e] documents

[cited by the regulated party] even comes close to the express, direct, and uniform interpretation" necessary to constrain agency's interpretive discretion); *cf. Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 516 (1994) (rejecting university's argument that agency had adopted inconsistent interpretive positions because agency's initial "intermediary letter did not purport to be a comprehensive review of all conditions" that the ambiguous regulation might impose).  Even under the *Alaska Hunters* doctrine, then, before an agency adopts a *definitive* interpretation of its own rule it remains free to hear new arguments, make adjustments, and change directions, all without having to undergo notice and comment.

The prior interpretation on which U.S. Magnesium most prominently hangs its hat is the Report to Congress.  The company argues strenuously and at length that EPA's current interpretation of its ambiguous 1991 final rule is inconsistent with the interpretation the Agency previously offered in its 1990 Report.  And in that Report, the company says, "EPA interpreted its regulation . . . as covering the aggregated wastestreams from *all* of the [Rowley facility's] pollution-control operations."  Answer Br. at 24 (emphasis added).

But even assuming (again without deciding) that the Report *did* suggest that *all* of the Rowley facility's pollution-control wastes qualify as "process wastewater from primary magnesium processing by the anhydrous process," and so are exempt from Subtitle C, U.S. Magnesium offers us no reason to think that this constituted anything more than a *tentative* view.  To start, the Report itself

- 26 -

repeatedly describes its conclusions as "tentative."[13]  And when it issued the

Report, EPA expressly solicited public comments, which it said it planned to use

"in conjunction with the Report to Congress to make the final regulatory

determination[s]" that it would enshrine in what was, ultimately, the final 1991

regulation.  *See* 55 Fed. Reg. at 32,135.  More process was thus expressly

contemplated and actually undertaken.  It may be that an agency can offer a

definitive interpretation of its own regulations in a variety of forms, perhaps even

in a congressional report.  And no doubt a report to Congress is a solemn thing.

But U.S. Magnesium hasn't given us any reason to conclude that the Report at

issue in this case was anything other than tentative.[14]

---

[13]  *See* Report to Congress, U.S. App. Vol. I at 184-85 (listing "[p]rocess wastewater from primary magnesium processing by the anhydrous process" among "[w]astes EPA [m]ight *[t]entatively* [r]ecommend to [r]emain [u]nder RCRA Subtitle D" (emphasis added)); *id.* at 201 ("tentatively concluded"); *id.* at 202 (same).  EPA's Federal Register notice of the publication of the Report includes the same description of its conclusions.  *See* 55 Fed. Reg. at 32,135 ("The report also presents two alternative decision-making approaches and *tentative* findings under each approach . . . ." (emphasis added)); *id.* at 32,137 ("[T]he Agency developed two approaches for *tentatively* determining whether regulation under RCRA subtitle C is warranted . . . ." (emphasis added)); *see also id.* (repeatedly describing what EPA "might find" in the future).

[14]  To be sure, an agency cannot sidestep the rule of *Alaska Hunters* merely by tacking the word "tentative" onto its every proclamation.  It's not enough for an agency just to *say* that its policy is tentative; to avoid the necessity of notice and comment, the policy must actually *be* tentative.  *Cf. Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416 (1942) ("The particular label placed upon [the order] by the [agency] is not necessarily conclusive, for it is the substance of what the [agency] has purported to do and has done which is decisive.").  Trying to decide whether an interpretation is, in substance, definitive or tentative may in

(continued...)

- 27 -

To this, U.S. Magnesium replies that there's more than just the Report to Congress to suggest that EPA previously adopted an interpretation of its 1991 rule that is at odds with its current interpretation. The company also points to certain of EPA's actions and communications. By way of example, U.S. Magnesium highlights the fact that the Agency, in June 1989, tested an aggregated wastestream at the Rowley facility, rather than individual wastes from the facility's different pollution-control devices. This action, the company says, confirms that in its 1990 Report to Congress EPA intended to treat all of the facility's pollution-control wastes as a unified whole for purposes of any exemption from Subtitle C, rather than distinguish between different wastes as it seeks to do now. *See* Answer Br. at 37-39.

This allegation has sparked an extended dispute between the parties about what exactly transpired during the site visit. EPA's site visit director, Robert Hall, has offered a declaration explaining that his sampling team *wanted* to test "numerous wastestreams discharging into ditches from the ends of unmarked

---

[14](...continued)
some cases prove challenging, much like the challenge that differentiating between substantive and interpretive rules has posed to courts for decades. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam) (describing distinction between substantive and interpretive rules "as 'tenuous,' 'fuzzy,' 'blurred,' and, perhaps most picturesquely, 'enshrouded in considerable smog.'" (citations omitted)). *See generally* John F. Manning, *Nonlegislative Rules*, 72 Geo. Wash. L. Rev. 893 (2004). In this case, however, U.S. Magnesium offers no persuasive reason why EPA's Report to Congress expresses, in its substance as well as semantics, anything other than a "tentative" interpretation, under any reasonable understanding of the term.

pipes," but that their access was "impeded" by steep embankments and piles of refuse and debris. Declaration of Robert Hall, U.S. App. Vol. III at 581. U.S. Magnesium, for its part, challenges Mr. Hall's account, arguing EPA could have safely tested individual wastestreams if it had really wished to do so.

But all this tussling over the facts overlooks the salient legal point. Even if the 1989 site visit evinced EPA's contemporaneous intention to aggregate all of the Rowley facility's pollution-control wastes for purposes of an exemption from Subtitle C, it still doesn't tell us whether EPA's commitment to that view of its regulations in its 1990 Report was *definitive*. We've operated in this opinion on the assumption that the 1990 Report itself demonstrated an intent to treat all of the Rowley facility's pollution-control wastes as a unified whole for purposes of the Subtitle C analysis; at best, the 1989 site visit seems to tell us no more than what we've already assumed. However viewed, the site visit simply offers no insight into whether the 1990 Report was itself a definitive or tentative interpretation.[15]

Beyond the site visit, U.S. Magnesium directs us to certain correspondence as evidence of EPA's alleged prior inconsistent interpretation. And the company

---

[15] To avoid this result, one might seek to argue that the site visit and the testing of this-rather-than-that waste stream *itself* constituted a definitive regulatory interpretation, not just further evidence about the meaning of EPA's Report to Congress. But U.S. Magnesium doesn't pursue this line of reasoning. *See* Answer Br. at 37-39 (arguing that EPA's conduct amounts to *evidence* of the Agency's future *intended* interpretation in the Report). And we would in any event be hard pressed to credit it, given that, among other things, the June 1989 site visit came almost three months before the publication of EPA's final rule on the Subtitle C exemption criteria in September 1989.

also points to the fact that, under EPA's current view disfavoring the aggregation of individual wastestreams, *none* of the waste from the Rowley facility would meet the high volume criteria set forth in the final 1989 rule for exemption from regulation under Subtitle C.  *See* Answer Br. at 51-55; *see also* 54 Fed. Reg. at 36,629-31.  These arguments once again lead the parties into thickly factual disputes.  EPA responds, for example, that U.S. Magnesium has misread the parties' correspondence.  It argues that any previous Agency error concerning the volume of the various pollution-control wastes was the result of bad information provided by the facility's then-owner.  And it adds that any inaccuracy in its previous measurement of the wastes produced at Rowley doesn't make a difference anyway because it isn't seeking to hold U.S. Magnesium to Subtitle C's terms for any wastes other than the five Complaint wastes.  But once again, none of this matters to the resolution of this appeal.  What does matter is that none of these arguments — no more than those analyzed above — establishes that EPA in its Report to Congress, or elsewhere, adopted a *definitive*, rather than a *tentative*, interpretation that the five Complaint wastes were "process wastewater from primary magnesium processing by the anhydrous method."[16]

---

[16]  One might reply to all this by suggesting that courts shouldn't recognize a distinction between an agency's tentative and definitive interpretations of its own regulations.  After all, under *Alaska Hunters*, adopting a tentative interpretation seems like the best of all possible worlds for the agency:  the agency can tell regulated parties what it wants them to do, and yet it's still free to embrace some new (assuredly tentative) interpretation whenever it wants.  What's

(continued...)

- 30 -

Having held that EPA was in this case free under *Alaska Hunters* doctrine to change its interpretation of its 1991 rule without undertaking notice and comment, one might worry that administrative law has simply abandoned regulated parties to the whims of an agency's arbitrary interpretive reversals. What about the reasonable and settled expectations of the regulated public? As it happens, however, there is no reason for undue alarm; at least two other layers of protection exist, even without the added aegis of *Alaska Hunters*.

First, the APA itself empowers courts to review "agency action, findings, and conclusions" if they are "arbitrary and capricious, an abuse of direction, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This requirement means, among other things, that an agency "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983); *see also Fabi Constr.*

---

(...continued)
to motivate the agency, then, ever to make an interpretation definitive if it can just add "tentative" to its all proclamations as a magic word, a sort of abracadabra of administrative decisionmaking that frees it to change direction whenever it likes? Given these concerns, one might suggest that, rather than going too far, *Alaska Hunters* doesn't go far enough: not only should the revision of *definitive* interpretations require notice and comment, but the reversal of *tentative* interpretations should, too. Whatever the merits of this hypothesis, though, it is not one that U.S. Magnesium has asked us to consider. As we've explained, U.S. Magnesium only urges us to follow *Alaska Hunters* as it currently stands, not to extend or adorn its teachings in novel ways, and the company has offered no reason why that doctrine required EPA to follow notice and comment in this case.

*Co. v. Sec'y of Labor*, 508 F.3d 1077, 1089 (D.C. Cir. 2007).  It is hard to see how this obligation could be any less salient when an agency seeks to abandon a prior interpretation in favor of a new one.  *See* Manning, *supra*, at 936.

Second, even if Congress repealed the APA tomorrow, the Due Process Clauses of the Fifth and Fourteenth Amendments would still prohibit the imposition of penalties without fair notice.  *See* U.S. Const. amend. V; *id.* amend. XIV, § 1.  Due process, after all, requires at the least that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  This principle applies to civil as well as criminal penalties, albeit in slightly different form.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). And it pertains when an agency advances a novel interpretation of its own regulation in the course of a civil enforcement action.  *See Walker Stone Co. v. Sec'y of Labor*, 156 F.3d 1076, 1083-84 (10th Cir. 1998) ("In order to satisfy constitutional due process requirements, regulations must be sufficiently specific to give regulated parties adequate notice of the conduct they require or prohibit." (quoting *Freeman United Coal Mining Co. v. FMSHRC*, 108 F.3d 358, 362 (D.C. Cir. 1997))); *see also General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-34 (D.C. Cir. 1995); *cf. Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170-71 (2007) ("[I]nterpretive changes [to regulations must] create no unfair surprise.").  If an agency could punish a regulated party for following the agency's own

interpretation of its own ambiguous regulations, after all, "the practice of administrative law would come to resemble 'Russian Roulette.'" *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987).

One might wonder about the potential application of these doctrines to U.S. Magnesium's cause. Interesting as these questions may be, though, they are not ones that we have to or may answer in this case. At no point in the proceedings before this court has the company raised any argument or sought decision of any issue arising under either § 706(2)(A) of the APA or the Due Process Clause. Accordingly, these arguments are waived. *See Rollins Envtl. Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) (finding waiver of due process notice argument in agency enforcement action involving novel interpretation of ambiguous regulation); *see also Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1172 n.17 (10th Cir. 2007).[17]

\* \* \*

For purposes of summary, we hold that EPA hasn't previously adopted a definitive interpretation of its 1991 rule. Even under the case law U.S. Magnesium asks us to follow, the Agency is at liberty to adopt without notice and

---

[17] At oral argument, U.S. Magnesium did characterize its argument as one of "fundamental fairness" — a phrase evocative of the Constitution's due process guarantee. But that argument appears nowhere in the company's brief. We generally will not pass upon issues raised for the first time at oral argument on appeal, *see Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998), and we see no reason to deviate from that practice here.

comment a reasonable interpretation of that ambiguous regulation. At least before us, U.S. Magnesium does not dispute that EPA has done so with this litigation. For this reason, we vacate the entry of summary judgment in U.S. Magnesium's favor and remand this matter to the district court. We do not prejudge what, if any, further proceedings may be appropriate in that court in light of and consistent with this opinion.