FILED
**United States Court of Appeals**
**Tenth Circuit**

**April 20, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

FRONTIER AIRLINES, INC.,

     Petitioner,

v.

DEPARTMENT OF HOMELAND
SECURITY,

     Respondent.

No. 25-9523

_____

**Petition for Review from the Department of Homeland Security**

_____

Adam P. Feinberg of Miller & Chevalier Chartered, Washington, DC, for Petitioner.

Weili J. Shaw, Attorney, Appellate Division (Brett A. Shumate, Assistant Attorney General, and Daniel Tenny, Attorney, Appellate Division, with him on the briefs) U.S. Department of Justice, Washington, D.C., for Respondent.

_____

Before **HARTZ**, **KELLY**, and **TYMKOVICH**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Petitioner-Appellant Frontier Airlines, Inc. (Frontier) seeks review of a final

order of the Transportation and Security Administration (TSA) upholding TSA's

determination that Frontier owed TSA for unpaid fees required to be remitted under

49 U.S.C. § 44940.  Exercising our jurisdiction under 49 U.S.C. § 46110(a), we deny the petition for review.

## Background

### A.  TSA Security Service Fee.

Under the Aviation and Transportation Security Act (ATSA), Pub. L. No. 107-71, 115 Stat. 597 (2001) (codified in scattered sections of 49 U.S.C.), TSA must impose a "security service fee," also known as the "September 11th security fee," on travelers to defray the costs of TSA's security services.[1]  49 U.S.C. § 44940(a)(1).  To aid in implementing the statutory scheme, TSA enacted related regulations.  49 C.F.R. Part 1510.  The statutory and regulatory schemes task airlines with collecting security service fees from passengers and then remitting those fees to TSA.  We discuss relevant statutory and regulatory provisions below.

The ATSA states that the Administrator of the TSA "shall impose a uniform fee, on passengers of air carriers . . . in air transportation and intrastate air transportation originating at airports in the United States, to pay for . . . civil aviation security services[.]"[2]  49 U.S.C. § 44940(a)(1).  Air transportation involves "the transportation by a common carrier of passengers or property[,]" by aircraft, "for

---

[1] The fee is currently set at $5.60 per one-way trip and cannot exceed $11.20 per round trip.  49 U.S.C. § 44940(c)(1); 49 C.F.R. § 1510.5(a).

[2] An "air carrier" is a "citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation."  49 U.S.C. § 40102(a)(2).  We use the term "air carrier" and "airline" interchangeably.

2

compensation[.]"[3] Id. § 40102(a)(5), (23), (25), (27). Chapter 49 does not define

"passenger." The services funded by the fee include, inter alia, salaries of TSA

personnel and federal law enforcement who provide aviation security; training and

equipment costs; costs of the air marshals program and of deploying federal law

enforcement to conduct aviation security; costs of performing civil aviation security

research; and the costs of making security-related capital improvements at airports.

Id. § 44940(a)(1)(A)–(I).

"All fees imposed and amounts collected . . . are payable to the Administrator

of the [TSA]." Id. § 44940(e)(1). The fee "shall be collected by the air carrier . . .

that sells a ticket for transportation[.]" Id. § 44940(e)(2). The fee "must be based on

the air travel itinerary at the time the air transportation is sold." 49 C.F.R.

§ 1510.9(b). An air carrier is liable to TSA for the fee regardless of whether it

recovers it from the passenger or not. Id. § 1510.9(c).

Air carriers cannot use any part of the fee collected from passengers to cover

collection, handling, or remittance costs associated with the fee except for any

---

[3] The security service fee applies to intrastate, interstate, and foreign air transportation. 49 U.S.C. §§ 44940(a)(1), 40102(a)(5). Interstate air transportation involves "the transportation of passengers or property by aircraft as a common carrier for compensation" between U.S. states, territories, possessions or the District of Columbia. Id. § 40102(a)(25). Foreign air transportation involves "the transportation of passengers or property by aircraft as a common carrier for compensation" between any place in the U.S. and a place outside of it. Id. § 40102(a)(23). Intrastate air transportation involves "the transportation by a common carrier of passengers or property for compensation, entirely in the same State, by turbojet-powered aircraft capable of carrying at least 30 passengers." Id. § 40102(a)(27).

interest accrued after collection but before remittance to TSA. 49 U.S.C. § 44940(e)(6). They must hold collected fees "in trust . . . for the beneficial interest of the United States[.]" 49 C.F.R. § 1510.11(b). Air carriers "hold[] neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected[.]" Id. Air carriers must "account for security service fees separately, but the fees may be commingled with the carriers' other sources of revenue." Id. § 1510.11(c). Air carriers must maintain separate accounting systems and records for the security service fees and submit quarterly reports that provide an accounting of the fees imposed, collected, refunded, and remitted. Id. §§ 1510.15, 1510.17. They must remit collected fees to TSA at the end of the month following the month in which the fees were collected. 49 U.S.C. § 44940(e)(3); 49 C.F.R. § 1510.13(a).

Regarding refunds, the statute only specifies that the "Administrator of the [TSA] may refund any fee paid by mistake or any amount paid in excess of that required." 49 U.S.C. § 44940(g) (emphasis added). TSA regulations state that "[a]ny changes by the passenger to the itinerary are subject to . . . refund of the . . . fee by the . . . air carrier, as appropriate." 49 C.F.R. § 1510.9(b). While neither the statute nor the regulations define "refund" or discuss in detail how refunds are to be handled, TSA provided guidance in a 2002 letter:

> When a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the . . . [f]ee involved is subject to a refund by the collecting carrier to the ticket purchaser. If such a ticket purchaser requests a refund of the . . . [f]ee collected, the carrier must provide the requester with a full refund of the fee. . . . [W]here an

4

air carrier does not refund . . . [f]ees to the ticket purchaser, <u>the fees must be remitted to or remain with TSA</u>.

R. 3–4 (emphasis added). An air carrier may offset any refund issued to a passenger when it has already remitted the fee to TSA by deducting said fee from its monthly total so long as the carrier maintains appropriate records. <u>Id.</u> at 4.

In a letter dated August 30, 2018, related to an audit of Frontier's security service fees,[4] TSA reiterated to Frontier the above-quoted guidance regarding refunds and stated that "Frontier's creation of a credit to the passenger that later expires is not a refund of the . . . [f]ee to the passenger." <u>Id.</u> at 27.

Subsequent guidance issued in 2020 clarified that "[r]etaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund." <u>Id.</u> at 261. That guidance further stated that "[i]f an air carrier does not refund the . . . [f]ee to the passenger, <u>the fee shall be remitted or remain with TSA</u>." <u>Id.</u> (emphasis omitted and added).

**B. Frontier's Refund Policies.**

When a customer buys a ticket from Frontier, he or she usually pays the fare, taxes, and the security service fee at booking. Aplt. Br. at 9. If the customer later cancels the ticket, Frontier either (1) returns the full amount of the fare, taxes, and the security service fee to the original method of payment, or (2) issues a travel credit for the full amount paid that can be used for future travel or other products or services offered by Frontier, such as baggage fees or seat selection fees. R. 113–14.

---

[4] This audit was unrelated to the audit that resulted in the instant appeal.

Frontier calls the latter a "credit shell." Id. The airline "accounts for both situations in the same way when the ticket is cancelled." Id. at 113.

Pursuant to its contract with customers, if a customer cancels a ticket, Frontier typically charges a fee of either $99 or the amount paid for the ticket, including the fare, taxes, and fees, whichever is lesser, and the customer may cover that fee by deducting the amount from the credit shell or through a separate method of payment. Id. at 114. When a cancellation occurs, Frontier engages in two separate transactions: first, it issues the full credit to the customer (fare, taxes, and fees), and then it applies the cancellation fee. Id. Even if the customer chooses to pay the cancellation fee using the credit shell, Frontier books the offsetting transactions as separate and distinct. Id.

If a customer uses a credit shell to purchase a new ticket, Frontier collects the security service fee on the new purchase and remits it to TSA. Id. at 115. But some credit shells expire; in such cases, Frontier "recognizes the amount of the unused credit shell as revenue[,]" meaning that "TSA receives no [f]ees when a ticket is cancelled in exchange for a credit shell and the credit shell later expires unused." Id. at 116.

## C. Procedural History.

In 2020, TSA conducted an audit of Frontier's security service fees and determined that the airline failed to comply with the ATSA. Id. at 38–54. Specifically, between July 2016 and December 2018, Frontier imposed and collected security service fees on certain one-way trips that were later cancelled. Id. at 40, 46–

6

In some cases, the customer cancelled the itinerary but Frontier did not issue a credit shell "because the customer chose to pay the cancellation fee with the credit and, after doing so, there was no credit remaining to be issued as a credit shell." Id. at 47, 116–17. In other cases, upon cancellation, Frontier issued a refund of the fares and fees as credit shells that expired unused, and subsequently "recorded these fees as refunds" rather than remitting them to TSA. Id. at 46–47. Citing TSA regulations, as well as its 2018 letter to Frontier stating that expiring credit shells were not refunds of the security service fee, TSA imposed a liability of $5,377,584.15 for the unpaid fees.[5] Id. at 45–46.

Frontier contested TSA's findings and imposition of liability, contending based on the language of the ATSA that TSA lacked the authority to assess a security service fee when a customer does not physically travel on an airplane, and that, even if it did have such authority, it refunded the fees to passengers in both circumstances and therefore TSA had no claim to the fees once they had been refunded. Id. at 73–80. In a December 2024 final order, TSA rejected Frontier's arguments and upheld Frontier's liability. Id. at 194–206. Frontier now appeals from that order.

---

[5] TSA determined Frontier's total liability resulting from the audit was $5,377,987.35, which included $403.20 in liability for an unrelated issue. R. 45–46. TSA calculated Frontier's liability after analyzing a random sample, identifying Frontier's error rate, and extrapolating the error rate onto Frontier's total trips. Id. at 46. Frontier does not contest either the statistical method by which TSA determined its liability for the expired credit shells, or the $403.20 liability for the unrelated issue. Aplt. Br. at 12 n.2; 14–17.

**Discussion**

Frontier raises three challenges on appeal. First, it contends that TSA lacked the authority under the ATSA to retain security service fees for customers who purchase tickets but later cancel them and never travel. Aplt. Br. at 14–17. Second, it contends that it properly refunded the fees to customers when it issued credit shells that later expired and when it used the security service fee to satisfy its cancellation fee. Id. at 17. Finally, Frontier argues that the fair-notice doctrine prohibits TSA from imposing "such retroactive liability" for expired credit shells because it clarified that such credit shells were not "refunds" under the ATSA "only after most of the transactions at issue" took place. Id.

Our review follows the Administrative Procedure Act, meaning that we must "hold unlawful and set aside" TSA's actions if they were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if TSA acted "in excess of [its] statutory jurisdiction[.]" 5 U.S.C. § 706(2)(A), (C); Arapahoe Cnty. Pub. Airport Auth. v. Fed. Aviation Admin., 242 F.3d 1213, 1218 (10th Cir. 2008); United Airlines, Inc. v. Transp. Sec. Admin., 20 F.4th 57, 62 (D.C. Cir. 2021).

**A. TSA Did Not Exceed Its Statutory Authority.**

Frontier's first challenge concerns whether TSA acted within the scope of its statutory authority. Aplt. Br. at 14–17. Because agency authority is only conferred by Congress through statute, we engage in statutory interpretation when determining the scope of that authority. Smith v. Bd. of Governors of Fed. Rsrv. Sys., 73 F.4th 815, 820 (10th Cir. 2023). We review matters of law, including such questions of

statutory interpretation, de novo.  Id.  When assessing whether an agency has acted within its statutory authority, we must "exercise [our] independent judgment[.]" 3484, Inc. v. Nat'l Labor Rels. Bd., 137 F.4th 1093, 1103–04 (10th Cir. 2025) (quoting Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024)).  As we discuss below, we hold that TSA did not exceed its statutory authority in imposing liability on Frontier.

### 1. The Plain Language of the Statute Does Not Require Physical Conveyance for TSA to be Entitled to the Fee.

Frontier argued below, and argues again here, that the ATSA precludes TSA from collecting security service fees from customers who cancel their tickets and never travel.  Aplt. Br. at 18; R. 73–76.  It points to the language of the ATSA, specifically subsection 44940(a)(1), which states that TSA shall impose the security service fee on "'passengers of air carriers . . . in air transportation' to fund certain 'costs of providing civil aviation security services.'"  Aplt. Br. at 18 (omission in original) (quoting 49 U.S.C. § 44940(a)(1)).  Frontier cites to dictionary definitions of "passenger," which seemingly contemplate the physical conveyance of an individual from one place to another, and the statutory definition of "air transportation," defined by statute to include the "transportation of passengers," to support its claim that TSA can only collect the fee from passengers who physically travel from one location to another.  Id. at 20–22.  It also argues that statutory language stating that the purpose of the fee is "to fund TSA's airport and flight operations for travelers who use security services" supports its position because an

9

individual who "never reaches the airport never contributes to any" of the costs defrayed by the fee. Id. at 22–23; Aplt. Reply Br. at 13. Frontier further points to other provisions of the statute, including subsection 44940(c)(1), which sets the amount for the fee and ties the fee to a "trip in air transportation[,]" to argue that such language supports its interpretation that the fee can only be imposed on someone who physically travels on an airplane. Aplt. Br. at 24. Frontier asserts that TSA's interpretation would lead to "absurd results" because TSA would be "entitled to the . . . fee even as to refundable tickets that are canceled and refunded to the customer's original method of payment in full." Id. at 24–25.

In rejecting similar arguments below, TSA determined that the statute does not permit Frontier or any air carrier to retain security service fees collected from passengers, pointing to statutory language stating that "[a]ll fees imposed and amounts collected . . . are payable to" TSA. R. 198–99 (alteration in original) (emphasis omitted) (quoting 49 U.S.C. § 44940(e)(1)). TSA also cited regulations stating that air carriers must hold fees in trust for the beneficial interest of the United States, that they have no legal or equitable interest in the fees, that they must account for the security fees separately, and that they cannot retain any portion of the fees to offset administrative costs associated with collection or payment of the fees. Id.; 49 C.F.R. §§ 1510.11(b)–(c), 1510.13(c). TSA rejected Frontier's interpretation of the statute as "highly artificial," noting that the phrase "in air transportation" modifies "air carriers" and describes the types of air carrier operations that are covered, rather than describing the passengers themselves. R. 199. On appeal, TSA makes similar

10

arguments, contending that the statute and regulations do not permit Frontier to keep the fees — instead, Frontier must either remit the fee to TSA or refund the fee to its customers.  Aplee. Br. at 13–21.

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."  Food Mktg. Inst. v. Argus Leader Media, 588 U.S. 427, 436 (2019).  "To interpret a statute's plain language, we give undefined terms their ordinary meanings, considering both the specific context in which the word is used and the broader context of the statute as a whole."  Hooper v. City of Tulsa, 71 F.4th 1270, 1282 (10th Cir. 2023) (citation modified).  If this examination yields a "clear answer," our inquiry ends.  Food Mktg. Inst., 588 U.S. at 436.

Frontier's interpretation of the statute is strained.  The key definition of "passenger" it cites states that a passenger is "[s]omeone who travels in a ship, airplane, boat, vehicle, etc., but without driving it or working aboard it; esp., a person taken by a common carrier under a contract of carriage or with the carrier's consent."  Passenger, Black's Law Dictionary (12th ed. 2024).  Frontier claims that two parts of this definition, "travels" and "taken," "imply actual conveyance from one place to another."  Aplt. Br. at 20 (emphasis omitted).  It also points to the statutory provision limiting the fee imposed "per . . . trip" to argue that the fee is tied to a "trip," and that the plain meaning of "trip" further suggests physical conveyance from one location to another.  Id.  But as Frontier itself acknowledges, this language only "impl[ies] actual

11

conveyance from one place to another" — it does not require it. Id. (emphasis added).

But even if we accept Frontier's definitions of these terms, as the dissent does, Dissent at 2, 4, we must still consider them in the broader context of the statute, Hooper, 71 F.4th at 1282. And when doing so, we see no indication that the fees are restricted only to customers who physically travel. In fact, rather than tying the fee to physical conveyance, the statute states that the fee shall be collected "by the air carrier . . . that sells a ticket for transportation[.]" 49 U.S.C. § 44940(e)(2) (emphasis added). As TSA noted in its final order, given the nature of air travel, Frontier may collect the fee upon purchase of a ticket and then remit that fee to TSA before the purchaser ever actually boards a plane. R. 200. Further, under Frontier's logic, airlines would be entitled to retain the fee charged to a ticket purchaser who never boards a plane to travel but does not cancel his or her trip and request a refund — a scenario that Frontier seemingly acknowledged below. Id. at 114 ("[C]ustomers also had a third option if they did not want to use their tickets: they could . . . simply fail to show up for the flight. In such cases, the customer was not entitled to a credit of any kind.").

Nor does the statute support Frontier's argument that the purpose of the fee is to fund civil aviation security services specific to someone who actually travels. The sort of services funded by the fee include personnel costs, such as salaries, training costs, costs of background investigations of TSA employees and other personnel, and the costs of deploying federal law enforcement to airports. 49 U.S.C. § 44940(a)(1).

12

These are not the sort of costs that are specific to any one traveler, unlike other services that TSA provides, such as individual screenings of passengers. And contrary to Frontier's contention, it is not just travelers who use the services funded by the fee; an airport employee may avail him- or herself of "security-related capital improvements" at airports without ever stepping foot on an airplane, while the public at large undoubtedly benefits from "civil aviation security research and development[.]" Id. § 44940(a)(1)(E), (H). In short, we are not persuaded that the plain language of the statute supports Frontier's position.

### 2. The Statutory and Regulatory Provisions Preclude Frontier from Keeping Security Service Fees for Itself.

Moreover, Frontier fails to point to any language in the statutory or regulatory schemes that permit Frontier or any other air carrier from keeping collected security service fees for themselves.

While the ATSA tasks air carriers "that sell[] a ticket for transportation" with collecting the fees, it also states that "[a]ll fees imposed and amounts collected" are payable to TSA, and that said fees "shall be remitted" at the end of the following month. 49 U.S.C. § 44940(e)(1)–(3). The statute also prohibits air carriers' use of any part of the fee to pay for administrative costs associated with the collection or remittance of the fee. Id. § 44940(e)(6). Further, TSA's regulations make clear that air carriers must hold the fees "in trust . . . for the beneficial interest of the United States" and that they "hold[] neither legal nor equitable interest in the . . . fees[.]" 49 C.F.R. § 1510.11(b). Each of these provisions make clear that the airlines act merely

13

as conduits for the fee from the purchaser to TSA, and that they cannot keep the fees for themselves.

Reading the refund provisions results in the same conclusion. The relevant subsection of the ATSA states that TSA "may refund any fee paid by mistake or any amount paid in excess of that required." 49 U.S.C. § 44940(g) (emphasis added). This permissive construction, contrasted with the mandatory language requiring air carriers to remit the fee, indicates that TSA retains discretion to provide a refund for mistaken or overcharged fees. See Lopez v. Davis, 531 U.S. 230, 241 (2001). The regulations also support this reading, as they state that any changes made by a passenger to his or her itinerary are "subject to . . . refund of the . . . fee by the direct air carrier[.]" 49 C.F.R. § 1510.9(b). And TSA's 2002 guidance states that "where an air carrier does not refund . . . [f]ees to the ticket purchaser, the fees must be remitted to or remain with TSA." R. 4.

Congress tasked Frontier with collecting the fee under the auspices of the federal government for a purpose designated by it (civil aviation security services) and provided various safeguards to ensure that the fees are not subverted. The elephant in the room is that under the dissent's interpretation, Frontier can retain those fees and book them as revenue in the event a passenger does not travel. We find it hard to believe, based on the face of the statute, that Congress intended to allow Frontier or any other airline to "obtain a windfall in the government's name" through the enactment of the ATSA. Aplee. Br. at 18. To the contrary, the statutory provisions, together with the regulatory provisions and guidance, make it clear that

14

Frontier cannot keep the fees for itself — it must either remit them to TSA or refund them to the purchaser.

As for Frontier's contention that travelers who cancel their tickets are not "passengers," and thus TSA's reading of the statute would permit the agency to collect fees for cancelled tickets that are refunded to the customer in full, that may well be the case on the face of the statute — after all, it says that the TSA <u>may</u> refund any fee paid by mistake or any overpayment. 49 U.S.C. § 44940(g). But that is not TSA's position, as stated in its 2002 guidance document, which provides a process by which air carriers may obtain refunds from TSA <u>so long as they refund the purchaser first</u>. R. 4. Perhaps there are more efficient ways to effectuate refunds than TSA's existing procedure. But that is not the question before us, and, in any event, it is not our place to question the wisdom or propriety of that procedure. <u>See</u> <u>River Runners for Wilderness v. Martin</u>, 593 F.3d 1064, 1070 (10th Cir. 2010).

Frontier also relies on the Court of International Trade's recent decision in <u>Southwest Airlines Co. v. United States</u>, 777 F. Supp. 3d 1318 (Ct. Int'l Trade 2025), for support, but that reliance is similarly unavailing. In <u>Southwest Airlines</u>, the court interpreted a statutory provision tasking airlines with collecting a fee from customers at the time of purchase and then remitting that fee to Customs and Border Protection (CBP) "for the provision of customs services in connection with . . . the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States." 777 F. Supp. 3d at 1321 (alterations in original) (quoting 19 U.S.C. § 58c(a)(5)(A)). The court determined "that CBP is entitled to the fee based on the

15

provision of customs services in connection with the arrival of a passenger, not upon the carrier's collection of the funds." Id. at 1326. Thus, the court held that when a customer cancels a ticket, CBP is not entitled to a fee because "there is no arriving passenger" and "CBP [therefore] provides no customs services[.]" Id. at 1326. Frontier advances similar logic here, contending that the ATSA's security service fee provision is similar and therefore TSA cannot collect any fee unless a passenger actually avails himself or herself of services funded by the fee. But Frontier's analogy is inapt for at least two reasons.

First, the CBP fee provision at issue in Southwest Airlines explicitly ties the imposition and collection of the fee to the arrival of each passenger, as the relevant statute states that the fee is "for the provision of customs services in connection with . . . the arrival of each passenger aboard a . . . commercial aircraft[.]" 19 U.S.C. § 58c(a)(5)(A) (emphasis added). But as we have already stated, no such language is present in the TSA fee statute; rather, the operative provision merely states that the fee shall be imposed "to pay for" certain civil aviation security services. 49 U.S.C. § 44940(a)(1). Contrary to Frontier's argument, that provision does not "condition[]" the fee on TSA "providing a particular service to a particular type of person[.]" Aplt. Br. at 26–27. And as we discussed above, even those who do not travel may still avail themselves of the security services funded by the fee.

Second, the Court of International Trade determined that the primary statutory support for the government's position in Southwest Airlines was in a "single, isolated provision" requiring the airline who issued the ticket to collect the CBP fee from that

individual. 777 F. Supp. 3d at 1327. It contrasted this language with other language in the statute that tied the fee to the provision of CBP's services to arriving passengers, concluding that the provision cited by the government "cannot be read in isolation . . . when the rest of the statute continuously connects the fee to the customs services rendered in connection with the arrival of each passenger." Id. But again, there is no language in the ATSA connecting the security service fee to the arrival or departure of any individual traveler. And as noted above, we find no support for Frontier's contention that it can keep the security services fees for itself when we read the relevant statutory and regulatory provisions together.[6] See King v. Burwell, 576 U.S. 473, 486 (2015) (noting duty to "construe statutes, not isolated provisions" (citation modified)).

For similar reasons, we find the dissent's arguments unpersuasive. The dissent contends that subsection 44940(a)(1) ties the imposition of the fee to the statute's "primary purpose of passenger service." Dissent at 4–5. But as we have discussed, that is not the case. The CBP provision assessed in Southwest Airlines illustrates this point. In contrast to that provision, there is no language in the ATSA tying the security service fee to the provision of civil aviation security services "in connection with" the departure of a passenger. Instead, there is only language generally tying the fee to the costs of the provision of such security services. Those services —

_____

[6] Because we distinguish this appeal from Southwest Airlines on these grounds, the government's decision to drop its appeal of the Southwest Airlines decision is of little consequence here. Aplt. R. 28(j) Letter at 1–2.

17

salaries, training, civil aviation research and development, and security-related capital improvements at airports —are not specific to any one passenger.  And given that those services are enumerated in a closed list, we do not read subsection 44940(a)(1) to suggest that the fee is tied to the provision of services to any one individual.  See Voter Reference Found., LLC v. Torrez, 160 F.4th 1068, 1087–88 (10th Cir. 2025) (Tymkovich, J.) ("[U]nder expressio unius est exclusio alterius, the notion is one of negative implication: the enumeration of certain things in a statute suggests that the legislature had no intent of including things not listed or embraced." (citation modified)).

Congress could have written the ATSA provisions in a manner similar to the CBP provisions.  But it chose not to do so.  Therefore, we must interpret and apply the statute as written.  In re Mallo, 774 F.3d 1313, 1317 (10th Cir. 2014).  Doing so, we reject these arguments to the contrary.

### 3.  Frontier's Remaining Arguments Are Not Persuasive.

Frontier offers several other arguments that we do not find persuasive.[7]  First, Frontier takes issue with TSA's reliance on statutory language stating that the fee "shall be collected by the air carrier . . . that sells a ticket for transportation[.]"  49 U.S.C. § 44940(e)(2).  Frontier argues that TSA was incorrect when it concluded in

---

[7] In its brief, TSA discusses statutory provisions where collection agents must refund overpayments to the original payor, to which Frontier responds.  Aplee. Br. at 17–18, 21–24; Aplt. Reply Br. at 12–13, 17.  While analogizing to these statutes may be illustrative, the statutory and regulatory framework provide us with sufficient grounds to reject Frontier's argument, so we need not discuss other statutes here.

its final order that this provision "unambiguously" means that the fee must be collected when a ticket is <u>sold</u>, and therefore the statute requires the fee to be collected regardless of whether travel actually occurs.  R. 200; Aplt. Br. at 27–28. We agree that this statutory provision does not govern <u>when</u> the fee ought to be collected, merely <u>who</u> collects it.  However, this is immaterial because, once Frontier collects the fees, it cannot keep them for itself.

Second, Frontier contends that subsection 44940(e) is an "ancillary" provision of the ATSA, and TSA cannot rely on such a provision to "override the core operative provision at the heart of the law[,]" namely that the security service fee "shall [be] impose[d] on passengers of air carriers . . . in air transportation[.]"  Aplt. Br. at 28–29; 49 U.S.C. §§ 44940(a), (e).  While it is true that Congress does not alter the fundamental details of a regulatory scheme in ancillary provisions, subsection 44940(e) is hardly "ancillary" — it governs the administration of security service fees, specifying, inter alia, the manner in which air carriers must collect and remit the fees and when they must remit them.  See <u>Burwell</u>, 576 U.S. at 497 (describing the "ancillary provision" at issue as a "sub-sub-sub section" of a different section of the U.S. Code).

Third, Frontier contends that TSA's regulations and informal guidance cannot overcome the statutory language.  Aplt. Br. at 31–33.  But as we have stated, the statutory scheme itself does not compel the outcome that Frontier seeks here.[8]

---

[8] In its reply brief, Frontier takes issue with TSA's reliance in its brief on subsection 44940(g), the refund provision.  The airline contends that, because TSA

Accordingly, we conclude that TSA did not exceed its statutory authority under the ATSA when it imposed liability on Frontier.

## B. Frontier Did Not Provide "Refunds" Under the ATSA.

Frontier alternatively argues that TSA erred because it properly provided refunds to customers in the situations that gave rise to the contested liability. Id. at 33–37. First, it contends that the expired credit shells were valid refunds and excluding them from the meaning of "refunds" is "inconsistent with the well-settled principle that merchants' credits are a refund[,]" citing to definitions of "refunds" from persuasive authority specifying that credits qualify as refunds. Id. at 35–36. But the cited definitions have little bearing on our analysis. TSA did not take issue with the fact that Frontier was issuing credit shells as refunds. See R. 47, 202–05.

---

did not rely on this provision in its final order, TSA's citation to it on appeal violates the principle that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87 (1943); Aplt. Reply Br. at 10. But it strains logic to suggest that we cannot consider and interpret the very statutory provision that allows Frontier to collect refunds from TSA in the first place. In any event, we review questions of statutory interpretation de novo, Smith, 73 F.4th at 820, and we must consider the "broader context of the statute as a whole," Hooper, 71 F.4th at 1282 (citation modified), so Chenery does not prevent us from considering subsection 44940(g).

Frontier also argues that subsection 44940(g) "cannot possibly have any relevance to the tickets where no fee amount was ever remitted to TSA because the customer canceled the ticket before the fees would have been paid to TSA[,]" citing to specific tickets audited by TSA wherein the fee amount was returned to the customer before Frontier remitted the fee to TSA. Aplt. Reply Br. at 11–12. Frontier contends that "[f]ee amounts never paid to TSA fall outside subsection (g) entirely." Id. at 12. Putting aside the obvious statutory authorization for Frontier's collection of the fees, these individual instances were not included in the record, Aplt. Reply Br. at 12 n.3, so we need not consider them, see Stewart v. U.S. Dep't of Interior, 554 F.3d 1236, 1243 (10th Cir. 2009).

Rather, it took issue with the fact that Frontier treated expired credit shells as refunds because in such cases, "Frontier has not returned or repaid the [f]ee amount to the passenger[.]" Id. at 204.

We agree with TSA that the expired credit shells at issue here are not "refunds" under the ATSA. Dictionary definitions of the term "refund" require the return or repayment of funds. E.g., Refund, Black's Law Dictionary (12th ed. 2024) ("The return of money to a person who overpaid . . . [or] "[t]he money returned to a person who overpaid."); Refund, The Am. Heritage Dictionary of the English Language (5th ed. 2022) ("A repayment of funds" or "[a]n amount repaid."). But, as TSA points out, by "taking the fee back from the passenger and booking it as revenue[,]" Frontier "effectively reverses [any] refund." Aplee. Br. at 33. Therefore, we agree with TSA that "Frontier's statutory and regulatory obligations are the same" in the case of an expired credit shell "as if it collected a fee and never refunded it: it again holds a collected security fee, and it must either remit the fee to TSA as required by statute or refund it to the passenger as authorized by TSA."[9] Id. at 34.

Second, Frontier argues that, because "it applied the refund credit . . . to satisfy a contractual cancellation fee[,]" and because these fees exceeded the security service fee amount, it properly refunded the security service fees. Aplt. Br. at 36–37. Recall that Frontier engages in two separate transactions when it issues a refund.

---

[9] Because the issue before us on appeal is whether expired credit shells are refunds as defined by the ATSA, we need not — and do not — decide whether credit shells generally are refunds under the statute.

First, it issues a full credit to the customer, inclusive of the fare, taxes, and fees.  R. 114.  Then, it applies the cancellation fee.  Id.  Frontier argues that, because the cancellation fee exceeded the amount of the security service fee, Frontier has effectively refunded the latter.  But once Frontier collects the security service fee, it must either remit the fee to TSA or return the fee to the customer.  That authority — to collect and refund fees — flows directly from the statutory and regulatory schemes.  Frontier cannot use its contract of carriage with the customer to circumvent its obligations under federal law by conditioning a refund of the security service fee on the satisfaction of Frontier's cancellation fee, particularly when Frontier only holds the fees in trust for the beneficial interest of the United States, retains neither legal nor equitable interest in the fees, and cannot use the fees to offset administrative costs associated with collection or payment of the fees.  49 C.F.R. §§ 1510.11(b)–(c), 1510.13(c).

To support this claim, Frontier cites to United Airlines, Inc. v. United States, 111 F.3d 551 (7th Cir. 1997), wherein the Seventh Circuit, reviewing a jury verdict, had to determine under the Internal Revenue Code whether United Airlines was entitled to refunds from the government where it had refunded an airline transportation tax to customers who cancelled their tickets in an initial transaction before applying a cancellation fee in a second transaction.  111 F.3d at 552–54.  But we find limited value from this decision given that it applied a highly deferential standard of review and interpreted a different statutory provision.  Beyond that, the circumstances are notably different because unlike in United Airlines, where the air

carrier was seeking a refund from the government for funds already remitted, Frontier never remitted the required funds to TSA.

Below, TSA concluded these arguments "amount[ed] to a semantic game to generate a windfall[.]"  R. 203.  Based on the foregoing, we agree.

### C. Frontier Had Fair Notice of TSA's Interpretation of "Refunds" Under the ATSA.

Finally, Frontier argued below, and argues again here, that even if TSA's interpretation of "refund" is correct, such an interpretation is new and inconsistent with its previous interpretations, thereby violating the fair-notice doctrine.  Aplt. Br. at 38–44; R. 221–22.  TSA rejected this position below because the "audit's findings flow directly from the statutory text of Section 44940, as well as the regulatory provisions implementing that statute[,]" while "TSA's guidance in 2002[] and . . . 2020 . . . [makes] clear that air carriers may not retain [f]ee amounts[.]"  R. 205.  We agree.

Due process requires that regulated persons or entities have "fair notice of conduct that is forbidden or required" by law.  Blanca Tel. Co. v. Fed. Commc'ns Comm'n, 991 F.3d 1097, 1116 (10th Cir. 2021) (quoting FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012)).  Thus, the law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  United States v. Magnesium Corp. of Am., 616 F.3d 1129, 1144 (10th Cir. 2010) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)).  This requirement applies when the government imposes civil penalties.  Id.  "Fair notice concerns will arise

23

when an agency advances a novel interpretation of its own regulation in the course of a civil enforcement action. It would be inappropriate for an agency, having long acquiesced in practice to one interpretation, to manufacture liability by retroactively applying a new interpretation." Blanca Tel. Co., 991 F.3d at 1116–17 (citation modified).

To support its claim, Frontier contends that TSA only gave notice of its position that expired credit shells are not refunds in August 2018 at the earliest, or else in 2020, but regardless after most or all of the conduct that gave rise to the contested liability (which occurred between July 2016 and December 2018). Aplt. Br. at 39–40; R. 26–27, 37.

Frontier's fair-notice argument presupposes that TSA imposed a penalty on the airline, see BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574 & n.22 (1996), or sought to deprive the airline of its own property, see United States v. 51 Pieces of Real Prop. Roswell, N.M., 17 F.3d 1306, 1314 (10th Cir. 1994). But that is not the case. TSA only sought to collect fees that Frontier had failed to remit under the statute — it did not impose any retroactive civil or criminal penalties. R. 42–44, 65, 205. And Frontier retained neither legal nor equitable interest in the fees. 49 C.F.R. § 1510.11(b). Therefore, the fair notice doctrine does not apply here.

But even if it did, the statutory and regulatory provisions, as well as TSA's 2002 guidance, make clear that Frontier has no right to retain any security service fees for itself. Although TSA may not have explicitly stated its position as to expired credit shells until at least 2018, given the above, we conclude that a "person of

24

ordinary intelligence" would have a "reasonable opportunity to know" TSA's position well before then. Magnesium Corp., 616 F.3d at 1144 (quoting Grayned, 408 U.S. at 108). This is particularly so given that we afford "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Fabrizius v. Dep't of Agric., 129 F.4th 1226, 1238 (10th Cir. 2025) (citation modified).

Frontier unconvincingly advances three other arguments to contend that "[n]o industry participant could have reasonably foreseen" TSA's "unnatural view of the law" with regard to its view that expired credit shells are not refunds. Aplt. Br. at 41. First, it contends that TSA's definition of "refund" "depends not on what the merchant issues at the moment of issuance, but on what the customer does with it in the future[,]" suggesting that a customer who was issued a check for the full amount he or she paid for a ticket but who never cashes that check would not have been issued a refund under TSA's interpretation. Id. at 41–42. But an expired credit shell is different from an uncashed check because, in the case of the former, Frontier places hurdles that limit when and how the purchaser can obtain the refund and limits the goods and services for which the credit can be used. Frontier also contends that TSA's view "invites all sorts of practical problems[,]" noting that, if Frontier issues a credit shell that expires unused, and the customer then purchases a new ticket in cash, TSA would be entitled to the fee twice. Aplt. Br. at 42–43. But that is a problem created by Frontier's actions and its decision to issue a putative refund through an expiring credit shell, not by the statute itself.

25

Next, Frontier notes that the 2020 guidance document states that "providing credit towards future services, <u>with or without an expiration</u>, does not constitute a refund[,]" but that the audit report and TSA's final order only took issue with expired credit shells. R. 37 (emphasis added), 59, 202–05; Aplt. Br. at 43. Frontier points to this discrepancy to argue that no "airline can be expected to make sense of this shifting regulatory landscape." Aplt. Br. at 43. But here, we need only focus on TSA's position as to <u>expired</u> credit shells, as TSA imposed liability on Frontier based on expired credit shells, not credit shells generally.

Finally, Frontier reiterates its position that credit shells are no different than store credits, citing to several similar challenges in other circuits brought by other airlines. Id. at 43–44. But, once again, the issue is not with credit shells generally but with expired credit shells. And we see no reason to give any weight to the fact that several other airlines have challenged TSA's interpretation of the statute when none of our sister circuits had weighed in on this issue.

The petition for review is **DENIED**.

25-9523, *Frontier Airlines, Inc. v. Dep't of Homeland Sec.*

**HARTZ**, J., concurring

This is a challenging case. The statute could have been clearer. The excellent opinions of my two colleagues frame the issues nicely.

I end up largely agreeing with Judge Kelly. The fee is not imposed on the airline, but on the passenger. *See* 49 U.S.C. § 44940(a)(1). The airlines serve as collection agents. *See id.* § 44940(e)(2) (the fee "shall be collected by the air carrier or foreign air carrier that sells a ticket"). The statute does not expressly state how the airlines are supposed to get money from their customers. But there is little doubt that those who enacted the statute assumed that the airline would collect the fee at the same time that it collected the fare and taxes for the trip. *See id.* § 44940(d)(2) (the fee applies only to tickets sold after the date when the fee is first imposed). Any other collection mechanism would be fraught with complications.

The statute provides that all collected fees should be paid by the airlines to TSA on a monthly basis. *See id.* § 44940(e)(3). But Congress was certainly aware that it is hardly unusual for airline customers to change their travel plans, sometimes canceling their flights altogether. Such changes would often result in the TSA fee no longer being justified. Nothing in the statute, however, permits an airline to give itself credit for a fee collected from a customer in that circumstance. On the contrary, "all . . . amounts collected . . . are payable to the" TSA Administrator. *Id.* § 44940(e)(1). And the *Refunds* provision of the statute confirms that it is the TSA Administrator who "may refund any fee paid by mistake or any amount paid in excess of that required." *Id.* § 44940(g). The

natural meaning of the word *refund* is to give money back to the person who paid the fee—namely, the airline customer. The refund may, of course, be handled through the collection agent (the airline) but only if the money is destined for the customer who paid the fee in the first place. Thus, the statutory implication is that TSA should pay a refund to the airline only if the airline has paid or will pay the money to the customer.

25-9523, *Frontier Airlines v. Department of Homeland Security*

**TYMKOVICH**, Circuit Judge, dissenting

Congress authorized TSA to impose a security service fee "on passengers" "to pay for the . . . costs of providing civil aviation security services." 49 U.S.C. § 44940(a)(1). Congress gave TSA no authority to collect fees outside of this purpose—from non-travelers to whom it never provided "security services." *Id.* Because Congress did not authorize this collection, TSA has no legal right to the fees disputed here. *See Citizens for Const. Integrity v. United States*, 57 F.4th 750, 764 (10th Cir. 2023) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986))). For this reason, I would grant Frontier's petition and set aside TSA's decision.

The Act's plain language imposes a simple condition on TSA's entitlement to the security service fee: the fee-payer's travel. The central provision in the Act establishing "[g]eneral authority" for the security service fee makes this point twice over. 49 U.S.C. § 44940(a). The authorizing provision stipulates that TSA's Administrator "shall impose a uniform fee[] on passengers of air carriers . . . in air transportation . . . to pay for the following costs of providing civil aviation security services." *Id.* § 44940(a)(1). This language conditions TSA's fee entitlement from fee-payers on their travel because (1) the fee is authorized from "passengers of air carriers," and (2) the fee is meant to subsidize the cost of "providing civil aviation security services." *Id.* The language of both phrases establishes that TSA is entitled

1

to security service fees only when a person travels and therefore engages TSA security services.

Several aspects of the statutory scheme support this interpretation. First, TSA has authority to impose the fee only on "passengers of air carriers." *Id.* Because the statute does not define "passengers," the court must look to its common meaning. *See Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025). Frontier and the majority cite Black's Law: a passenger is "[s]omeone who travels in a ship, airplane, boat, vehicle, etc., but without driving it or working aboard it; esp., a person taken by a common carrier under a contract of carriage or with the carrier's consent." *Passenger*, BLACK'S LAW DICTIONARY (12th ed. 2024). The Oxford English Dictionary similarly defines passenger as a "person in or on a conveyance other than its driver, pilot, or crew." *Passenger*, OXFORD ENGLISH DICTIONARY (2d ed. 1989). Central to both definitions is physical movement. Common understandings confirm the travel requirement central to these dictionary definitions: a friend who asks to hitch a ride to an event is a passenger in your car; the friend who backs out from the ride is not. A news story recounting the number of passengers in a tragic bus crash excludes from the passenger number those who providentially stayed home. Contrary to the majority's assertion that "passenger" does not require physical travel, *ante* at 11–12, its plain meaning counsels otherwise. The plain meaning of "passengers" in § 44940(a)(1) shows that TSA is authorized to impose the fee only on persons who physically travel in airplanes.

2

Second, the conclusion that TSA's fee authorization is limited to travelers is bolstered by the purposes statutorily prescribed for the security service fee. The fee is imposed on passengers "to pay for the . . . costs of providing civil aviation security services," and must be "reasonably related to [TSA's] costs of providing services rendered." 49 U.S.C. §§ 44940(a)(1), (b). That the fee offset TSA's costs of "providing" services and that the fee be reasonably tied to "services rendered" implies that the fee is conditioned on services rendered to the subject explicitly mentioned in those provisions—the fee-paying passenger who presents himself at airport security.

Admittedly, the fee statute's language permits two possible interpretations: that the fee pay for and be related to services provided to the *passenger* who pays the fee or to *other travelers*, and the majority settles on the latter interpretation. I do not. To settle the ambiguity, I turn to context. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning . . . of certain words or phrases may only become evident when placed in context."). And in context, the most natural interpretation is the former—that the fee pay for and relate to services provided to the passenger. The context provides that "[i]n imposing fees under subsection (a)," the fees must "reasonably relate[]" to the "costs of providing services rendered." 49 U.S.C. § 44940(b). And the fees imposed under subsection (a) are imposed "on passengers of air carriers." *Id.* § 44940(a)(1). As discussed above, because "passengers" travel, receive TSA service during that travel, and are the only subjects receiving such service named in the provision tying the security fee to "services

3

rendered," they are the natural subjects receiving "services rendered."  Taking these two sections together, the fees imposed on passengers must relate to the services rendered—contextually, services rendered to them.  To interpret these purpose-defining provisions to impose the fee on non-travelers for TSA services provided *to others* reads into the statute words that are not there.[1]  The fee's statutory purpose to offset *the passenger*'s service cost strengthens the plain language argument above that TSA is authorized to collect fees from travelers alone.

The majority's plain-language counterarguments are not persuasive.  The majority asserts that the definition of passenger "implies" but does not "require" travel yet provides no definition of passenger excluding the concept.  *Ante*, at 11–12.  Next, it uses context to argue that TSA's fee entitlement attaches regardless of travel.  *Ante*, at 12.  It thus implies that TSA is entitled to fees when the air carrier collects those fees at sale under 49 U.S.C. § 44940(e)(2),[2] yet later backtracks from this position.  *Ante*, at 12, 17.  More convincingly, it examines the statutorily prescribed

---

[1] To conclude that TSA would be entitled to a ticket-canceler's fee, one must conclude that the statute's imposition of a fee on "passengers" "to pay for the . . . costs of providing civil aviation security services" includes paying for the cost of providing service *for others*, and the statute's restriction that the fees imposed on passengers be "reasonably related to [TSA's] costs of providing services rendered," includes "costs of providing services rendered" *for others*.  Without this expansion, both provisions tie the fee imposed on the passenger to the service rendered, implicitly, service rendered to the only person the provisions mention—the passenger.  The majority's interpretation is possible, but not convincing.  *Brown & Williamson*, 529 U.S. at 132.

[2] Section 44940(e)(2) states that "[a] fee imposed under subsection (a)(1) shall be collected by the air carrier or foreign air carrier that sells a ticket for transportation described in subsection (a)(1)."

purposes for the fee, urging that the litany of purposes, such as funding salaries and training, shows that TSA's fee entitlement is not tied to individual service provided to a passenger. *Ante*, at 12–13. While its analysis is reasonable, the majority skips the opening phrase that characterizes the litany of purposes that follow: the central provision stipulates that the TSA Administrator is authorized to impose a fee on passengers "to pay for the following costs of *providing civil aviation security services . . . .*" 49 U.S.C. § 44940(a)(1) (emphasis added). A list of TSA's administrative and overhead costs follows. This opening phrase tying the fee to the cost of service characterizes the litany that follows—salary, training, security research costs, etc.—those costs are all subordinated to the primary purpose of passenger service. *See id.* Bolstering the reading that the fee is primarily tied to passenger service is a provision that the majority does not mention—that the TSA Administrator must "ensure that the fees are reasonably related to the . . . costs of providing services rendered." *Id.* § 44940(b). As discussed above, the better reading of both provisions is that they tie the fee's purpose, and therefore TSA's authorization to collect the fee, to individual service provided to a traveling passenger.

Finally, the majority looks to the statute's remittance provisions, concluding that they require Frontier to remit the disputed amount. But these provisions do not apply. They do not require Frontier to remit money that it collected in *anticipation* of § 44940(a) applying to the passenger's travel. The central obligation that TSA and the majority rely on is § 44940(e): "[a]ll fees imposed and amounts collected *under*

5

*this section* are payable to the Administrator of [TSA]" and "[a] fee collected *under this section* shall be remitted on the last day of each calendar month." *Id.* §§ 44940(e)(1), (3) (emphasis added). But, because the disputed amounts were not imposed on a "passenger of an air carrier," no security service fee was imposed "under this section," and so no fee need be remitted. *See id.* § 44940(a).

The majority insists that the remittance procedure applies, regardless of whether TSA is entitled to the collected amount. It points to the contrast between the mandatory language of the remittance provisions and the permissive language of TSA's refund authority. *Ante*, at 13. Arguably, the contrast shows that the fee amount must be remitted in all circumstances, even if TSA is not entitled to the fee, *i.e.* from a non-traveler, because airlines "*shall* . . . remit[]" fees collected under the Act to TSA while TSA "*may* refund any fee paid by mistake or any amount paid in excess." 49 U.S.C. §§ 44940(e)(3), (g) (emphasis added). The contrast, however, does not prove the majority's point. The remittance procedure applies only to amounts collected "under this section"; it does not apply to amounts that Frontier collected in *anticipation* of the authorizing section applying once a passenger travels. *Id.* §§ 44940(e)(1), (3). When Frontier and other airlines collect the fee before passenger travel, they are not collecting under the statute because the statute does not require them to collect at sale.[3] They are collecting in anticipation of the statute

---

[3] One can imagine a scenario where airlines collect the fee at the gate as passengers board the plane. No statutory provision *requires* airlines to collect the fee at the time of sale. The Act only requires that the fee "be collected by the air carrier

6

applying and levying an obligation on them to collect fees from passengers and to remit those fees. In other words, the provision authorizing TSA to refund overpaid fees and those paid in error does not expand the statutory scope of fees that the remittance provision requires airlines to remit.

*Southwest Airlines* concluded, on similar facts, that a fee statute's remittance procedure did not govern money collected in anticipation of the fee statute applying to entitle the agency to the fee. 777 F. Supp. at 1328–29. The agency (CBP), like TSA and the majority, argued that once the airline had collected the customs fee, the statute required it to remit that fee to CBP, regardless of CBP's entitlement. The *Southwest Airlines* court, however, disagreed. It concluded that the fee remittance procedure did not apply unless the provision authorizing CBP to the amount applied, and the authorization provision applied only to persons who had traveled

---

or foreign air carrier that sells a ticket for transportation." 49 U.S.C. § 44940(e)(2). Regulations likewise do not require that the fee be collected at sale, and in fact confirm that fees collected prior to sale are not fees collected "under" § 44940 and therefore are not bound by the statutory remittance procedure. Regulations require that the fee be "based on the air travel itinerary at the time the air transportation is sold," but permit "[a]ny changes by the passenger to the itinerary" to result in "additional collection or refund of the security service fee." 49 C.F.R. § 1510.9(b). Together, these regulations show that the amounts collected by airlines at purchase are not fees collected under § 44940, because if they were, TSA must apply § 44940's mandatory remittance procedure. The regulation permitting airlines to refund passengers cannot overcome the remittance requirement because regulations do not trump statutes. *See Mabry v. State Bd. of Cmty. Colls. & Occupational Educ.*, 813 F.2d 311, 315 (10th Cir. 1987). In other words, the existence of the regulation permitting airlines to refund in lieu of remittance reveals TSA's belief that fees collected prior to travel (in anticipation of § 44940 applying to entitle TSA) are not fees collected "under" § 44940—because if these fees were collected "under" § 44940, TSA by statute *must* require airlines to remit those fees to it.

7

internationally.  In other words, even though Southwest had collected a certain amount in anticipation of remitting it to CBP as the customs fee, the customs statute never governed that amount because the money collected was not a "fee" under the customs statute unless travel occurred and CBP service was provided.  *Id.* at 1328. Because the statute never applied to transform the collected money into a customs fee, neither did the statute's remittance procedure for those fees apply.[4]  Southwest was free to dispose of canceled tickets, including the amount collected for the customs fee, as a matter of contract between it and the non-passengers.

In sum, the plain language of ATSA shows that TSA is not entitled to the money that Frontier collected from non-passengers who never availed themselves of TSA's services.  And TSA did not bear its burden to show why Frontier must nevertheless satisfy ATSA's remittance procedure—that procedure applies only to fees properly collected under the Act, and no such fees were collected here.

Respectfully, I dissent.

---

[4] The majority distinguishes *Southwest Airlines* as inapposite by concluding that CBP's fee scheme (and its remittance procedures) were contingent on travel, unlike here.  *Ante*, at 16.  Even if the schemes are distinct, *Southwest Airlines* still stands for the proposition that statutory remittance procedures in a fee statute do not govern money that is not governed by the fee statute.  And, as addressed previously, the majority is wrong in the first instance: the TSA-fee scheme is contingent on passenger travel.  Just as the customs-fee statute limits CBP entitlement to the "provision of customs services in connection with . . . arrival of each passenger," the security service fee limits TSA's entitlement to the fee by requiring it to "reasonably relate[]" to the "costs of providing services rendered" to the fee-paying passenger. 19 U.S.C. § 58c(a)(5)(A); 49 U.S.C. § 44940(b).  Like in *Southwest Airlines*, the statutory remittance procedure does not govern money collected in anticipation that the statutory fee scheme will apply.  That money is governed by private contract.  *See Southwest Airlines*, 777 F. Supp. at 1328.

8